IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>RAMON SANCHEZ-DIAZ,<br><br>                Defendant. | ORDER<br><br>Case No.  2:05CR411DAK |

      This matter is before the court on Defendant Ramon Sanchez-Diaz's Motion to Suppress Evidence seized from a search of defendant and his home on May 31, 2005.   The court held an evidentiary hearing on the motion to suppress on November 29, 2005, and closing arguments on February 9, 2006.  At the hearings, Defendant was present and represented by Randy S. Ludlow, and Plaintiff was represented by Veda M. Travis.  The court has carefully considered the evidence and testimony presented at the evidentiary hearing, the parties' memoranda, and the law and facts relating to this motion.  Now being fully advised, the court renders the following Order.

### A. FINDINGS OF FACT

      Orlando Ruiz is a corporal with the Orem City Police Department.  On May 31, 2005, Ruiz was working as a detective with the Utah County Major Crimes Task Force ("Task Force") where he had been assigned for approximately three years.  As a detective with the Task Force,

Ruiz worked with confidential informants. On or about May 31, Ruiz received information from an informant regarding an individual named Ramon.

According to Ruiz, the informant had worked with the Task Force for two years and had provided reliable information during that time regarding narcotics distribution and trafficking which had led to arrests in at least a dozen cases. The informant told Ruiz that an individual named Ramon was selling large quantities of methamphetamine in Utah County.

Based on the informant's information, on May 31, 2005, Ruiz had the informant place a telephone call to Ramon. In that call, the informant ordered methamphetamine and made arrangements with Ramon to meet at a market located at 200 North State Street in Orem at approximately 9:15 p.m. Ruiz and Detective Theron Leany were present when the informant made the phone call to Ramon. The informant spoke with Ramon in Spanish. Detective Leany speaks and understands Spanish, and, in his experience, what the informant said was consistent with making arrangements for the purchase of methamphetamine.

After arrangements for the deal had been made, members of the Task Force set up surveillance in the area of the market at 200 North State Street. At the time surveillance was set up, the market was closed. At approximately 9:20 p.m., a Nissan Sentra pulled into the parking lot of the market and drove slowly through the lot. It appeared to the surveillance units that the occupant of the Sentra was looking at vehicles in the area.

The officers noticed that one of the taillights on the Sentra was burned out. The Sentra pulled out of the parking lot of the market, and Ruiz then had the informant make another phone call to Ramon. The informant told Ramon that his/her car had broken down and asked Ramon to

meet him/her at a Checker Auto store located at 1100 North State Street in Orem. Ramon agreed.

Surveillance units saw the Sentra on a side road near 400 North State Street. The Sentra was then seen turning onto State Street, heading northbound. Ruiz, who was with Detective Leany and the informant, pulled his vehicle alongside the Sentra. The informant was able to look out the window and identified the driver of the Sentra as Ramon. Once Ramon was positively identified, Ruiz contacted Officer Steve Norman, a uniformed officer with the Orem City Police Department, and asked him to stop the Sentra. Ruiz advised Officer Norman that a drug deal had been arranged and he provided Norman with a description of the Sentra, including the license plate, the make and model of the car, and the burned out taillight which is a violation of Utah law.

Norman located the Sentra, confirming the vehicle information provided to him by Ruiz, including the fact that one of the taillights was burned out. Norman initiated a traffic stop at approximately 930 North State Street and made contact with the driver, who was the sole occupant in the car. Norman requested a driver's license, registration and proof of insurance.

Shortly after Norman initiated the traffic stop, Officer Christensen arrived to assist. The driver of the Sentra, who was later identified as defendant Ramon Sanchez-Diaz, began looking for the requested documents. Sanchez-Diaz then advised Officer Norman that he did not have his driver's license with him. Driving without a driver's license is a violation of Utah law.

During this initial encounter, Sanchez-Diaz appeared to be nervous. Norman spoke to him in English and Sanchez-Diaz responded in broken English. Despite the broken English, Sanchez-Diaz appeared to understand Norman's requests.

Norman asked Sanchez-Diaz to get out the vehicle. The two then walked to the sidewalk, behind the car. When they got to the sidewalk, Sanchez-Diaz put his hands into his pockets. For officer safety, Norman asked Sanchez-Diaz to remove his hands from his pockets. Norman then asked Sanchez-Diaz questions regarding his personal information. Sanchez-Diaz provided the officer with some kind of identification card which was in the name of Ramon Sanchez-Diaz, date of birth of October 10, 1976. Sanchez-Diaz told Norman that his address was 463 East 500 South in Provo.

As Officer Norman was talking to Sanchez-Diaz on the sidewalk, Detective Lane Critser, a certified dog handler with the Task Force, arrived with his certified narcotics detention trained dog, Danno. Danno, who has been certified as a narcotics detection dog by POST, has been trained to detect the odor of marijuana, cocaine, heroin and methamphetamine. Danno has been certified annually and receives 4 to 8 hours per week of departmental training. Critser has been a certified dog handler since 1995. Critser asked Norman if he would like Danno to perform a sniff of the vehicle and Norman indicated that he would.

Officer Norman had his dispatcher run Sanchez-Diaz's information. He continued to draft the citation, but as he did, Sanchez-Diaz again put his hands into his pockets. After Norman asked the defendant to remove his hands from his pockets, Sanchez-Diaz put his hands back in his pockets. Norman then conducted a pat down of Sanchez-Diaz, but did not locate any weapons. In his report, Norman wrote that he put his hands "in" Sanchez-Diaz's pockets during the pat down search. Norman testified that the word "in" was a typographical error and that he put his hands "on" Sanchez-Diaz's pockets. Sanchez-Diaz testified that the only time Officer Norman put his hands in defendant's pockets was when Norman took defendant's wallet out of a

pocket.

As Norman was conducting the pat down of Sanchez-Diaz, his dispatcher advised that no driver's license could be located for the defendant. During this time period, Detective Critser was using Danno to conduct an exterior sniff of the Sentra. During the deployment, Danno went towards the open window on the driver's door, and began to sniff intently. Danno then followed along the base of the door and went over to the door seam. He then followed the seam to the bottom of the door and began to scratch.

When Danno detects the odor of narcotics, Detective Critser is able to pick up a noticeable change in Danno's body behavior. When Danno is able to pinpoint where the odor is coming from, he scratches, bites or barks, which is known as an aggressive indication. Critser continued to deploy Danno on the exterior of the vehicle. When reaching the open driver's window again, Danno got up on his rear legs and appeared to be trying to pull himself inside the car. Critser then advised Officer Norman of the indication and told Norman that he was going to conduct an actual search of the vehicle's interior.

Critser then deployed Danno inside the car and Danno indicated, by scratching, on the driver's seat. Critser then put Danno back in his police vehicle and began a hand search of the interior of the car. Norman assisted Critser with the interior search, but neither officer located any seizable quantities of narcotics.

At the time Critser and Norman were searching the vehicle, Officer Christensen was standing on the sidewalk with Sanchez-Diaz. When Critser and Norman did not locate any drugs during the search of the interior of the vehicle, Critser believed, based on his experience and Danno's indication on the driver's seat, that drugs were probably on Sanchez-Diaz's person.

Critser then told Norman what he suspected and suggested that Sanchez-Diaz should be searched.

Norman then told Christensen to check Sanchez-Diaz's clothing. Ruiz and Detective Leany arrived sometime during that time and were advised by Norman that the canine had indicated for the presence of narcotics, but that they had not been able to locate anything up to that point. Norman then returned to the vehicle to continue searching and Leany approached Sanchez-Diaz.

Leany, who speaks Spanish, explained to Sanchez-Diaz that the dog had indicated for the presence of drugs in the vehicle and asked Sanchez-Diaz why that would have happened. Sanchez-Diaz at first told Leany that he did not use drugs, then he said that he did use drugs a little, but didn't know why the dog would indicate. Leany asked Sanchez-Diaz if he would mind if Leany searched his person. Sanchez-Diaz said "no" he wouldn't mind and then, on his own, extended his arms out to the side to give Leany an opportunity to search him.

Sanchez-Diaz claimed at the evidentiary hearing on the motion to suppress that he felt he had to consent to the search because he would be searched anyway. At the time Detective Leany asked Sanchez-Diaz for consent to search his person, there was traffic on State Street. Leany did not pull a gun on the defendant, did not yell at him and did not threaten him. None of the officers present threatened Sanchez-Diaz.

After receiving consent for the search, Leany patted Sanchez-Diaz down; as he came up the thigh area, Leany noticed that a baggy folded up inside a napkin had fallen out of Sanchez-Diaz's shorts, onto the ground. Leany looked down and could see the baggy which contained a white crystal substance which appeared to him to be methamphetamine. Leany was familiar

with the appearance of methamphetamine from his experience on the Task Force.

When the napkin-covered baggy fell onto the ground, Sanchez-Diaz looked at it and immediately began saying he was sorry. He then looked at Leany and, in Spanish, said, "please forgive me, this is the first time." At that point, Leany stopped the defendant and told him that he needed to explain some things. Leany then explained defendant's rights under *Miranda* in Spanish. Detective Leany had memorized the *Miranda* warning from a translation which had been posted in the booking area of the Orem City Police Department. Leany told Sanchez-Diaz that he had the right to remain silent, that anything he said could and would be used against him in a court of law; that he had the right to have an attorney present with him while he was being questioned; that if he could not afford an attorney, the state would appoint one to represent him. Leany also explained that if Sanchez-Diaz decided to talk without an attorney present, that he could stop answering questions at any time.

Sanchez-Diaz told Leany that he understood his rights and agreed to talk with Leany. During the evidentiary hearing, Sanchez-Diaz testified that Detective Leany did not advise him of his rights under *Miranda*. Sanchez-Diaz claimed that Leany told him that he could go free if he turned in two other individuals. The court, however, does not find this testimony credible. Sanchez-Diaz told Leany that he was addicted to methamphetamine and that the drugs he had on him were for his personal use. He also told Leany that he was on
his way to see a girlfriend and they were going to smoke some of the methamphetamine.

Based on his information from the confidential informant, Leany believed that Sanchez-Diaz was distributing narcotics and, as a result, asked the defendant if he had any more drugs at his house. Sanchez-Diaz said there were no drugs at his house and told Leany that

officers could search.  Leany asked if Sanchez-Diaz would take officers back there for the search and the defendant agreed to do that.  Sanchez-Diaz then gave Leany the address of 463 East 500 South in Provo.  That address did not exist.  Leany then checked around the corner at 463 South 500 East and found that address did exist.  Leany, along with Sgt. Troxel, went to the door and knocked.  An adult Hispanic female, who identified herself as Martina Gonzales, came to the door.  Leany identified himself as a police officer and asked Ms. Gonzales if she knew Ramon Sanchez-Diaz.  Ms. Gonzales said he was her husband, that he lived at that location but that he was not home at the time.

 Leany told Ms. Gonzales that Sanchez-Diaz had been arrested and was in police custody for possession of narcotics.  Leany told Ms. Gonzales that he was concerned that other narcotics could be in the house which might pose a threat to her and her children.  Ms. Gonzales told Leany that she knew nothing about narcotics in the house, but that he was welcome to come inside and search.  She then opened the door further to allow officers to go inside.  Leany told Ms. Gonzales that there were several officers who would like to search and he also asked permission to bring a dog inside for the search.  Ms. Gonzales said that was fine and told Leany that she just wanted to tend to her children.  Leany assisted her with the children while the other officers present began searching.

 Within minutes of the start of the search, one of the officers located a glass methamphetamine pipe on top of the refrigerator.  Leany asked Ms. Gonzales about the pipe, and she said her husband used it to smoke drugs.  She also told Leany that was the only thing she knew about.  Leany then asked Ms. Gonzales if there was any place where her husband may have hidden drugs in the home, and she said she did not know, but that officers were welcome to

8

look anywhere.

During the search, Troxel located a large quantity of suspected methamphetamine in the bathroom. With that discovery, Leany asked Ms. Gonzales if she would be willing to give him a written statement regarding her consent to search, and she agreed. Ms. Gonzales then wrote a statement.

B. CONCLUSIONS OF LAW

I. Search of Sanchez-Diaz's Person

Sanchez-Diaz argues that the search of his person was conducted without a warrant and was not justified as a valid warrantless search because it was conducted without his voluntary consent. First, Sanchez-Diaz contends that the initial search of his person was not necessary because there was no reasonable suspicion that he may be armed and dangerous.

An officer may "perform a pat-down of a driver and any passenger upon reasonable suspicion that they may be armed and dangerous." *Knowles v. Iowa*, 525 U.S. 113, 118 (1998). Before Norman initiated the stop, he knew that Sanchez-Diaz was a suspected drug dealer who was on his way to an arranged sale with a confidential informant. After the stop, Sanchez-Diaz repeatedly failed to comply with Norman's instructions to keep his hands out of his pockets. Sanchez-Diaz claims that he was merely cold, however, he also recognizes that officer safety is a valid concern.

"Since police officers should not be required to take unnecessary risks in performing their duties, they are authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop." *United States v. Perdue*, 8 F.3d 1455, 1423 (10th Cir. 1993). "Drug traffickers may carry weapons to protect

their merchandise, their cash receipts, and to intimidate prospective purchasers." *United States v. Nicholson*, 983 F.2d 983, 990 (10th Cir. 1993); *see also United States v. McKissick*, 204 F>3d 1282, 1293 (10th Cir. 2000) (noting that it is well-established that "[g]uns are a tool of the trade in the distribution of illegal drugs."). The court concludes that there were adequate safety reasons for the officers to conduct pat down searches on Sanchez-Diaz as a result of his suspected connection with a drug sale and his repeated attempts to put his hands in his pockets.

Next, Sanchez-Diaz argues that he did not voluntarily consent to the search of his person. Defendant acknowledges that a warrantless search can be valid if it was performed with the defendant's voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The government, however, bears the burden to prove that the defendant's consent was voluntary and, absent such proof, a court will not imply that there was voluntary consent. *United States v. Pena-Sarabia*, 297 F.3d 983, 986 (10th Cir. 2002) *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993).

In determining whether consent was given voluntarily, courts look to a totality of the circumstances test. *Bustamonte*, 412 U.S. at 227 ("Whether a consent to search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."). As a general rule, the Tenth Circuit has found consent to be voluntary when there is no evidence of coercion and the testimony establishes that consent was freely given, even when a defendant is in custody.

> It appears [the officer] did not unholster his weapon, did not use an
> insisting tone or manner, did not physically harass defendant, and
> no other officers were present. Further, the incident occurred on
> the shoulder of an interstate highway, in public view. [The officer]
> sought permission specifically to look in the trunk, and defendant

> got out of the car and opened the truck himself. Defendant makes
> no contention that he misunderstood [the officer's] request; any
> such claim is precluded by defendant's act of opening the trunk.
> Thus, defendant's consent was unequivocal and specific.

*Soto*, 988 F.2d at 1558 (10th Cir. 1993); *see United States v. McKneely*, 6 F.3d 1447, 1453 (10th Cir. 1993); *see also United States v. Pena-Sarabia*, 297 F.3d 983, 987 (10th Cir. 2002) (finding consent voluntary even though granted in response to "rapid-fire questioning" because police did not use threats or promises, did not draw or display weapons and did not induce consent through trickery).

The evidence in this case shows that Leany did not coerce Sanchez-Diaz into consenting to the search or do anything to put Sanchez-Diaz under duress. Although Leany confronted Sanchez-Diaz with the dog indication in the car, Leany never raised his voice, never brandished his weapon and never threatened Sanchez-Diaz. There was also no language barrier between Leany and Sanchez-Diaz. The stop occurred on a busy street, and although other officers were present at the scene, it appears from the record that only Officer Christensen was standing nearby at the time Leany asked for consent.

The court does not believe that the number of pat down searches done by the officers was coercive. The credible evidence before the court demonstrates that there were possibly three or four pat-down searches before Leany sought permission to search. These searches were justified under the circumstances and not so intrusive that the court believes that they made the situation coercive. Moreover, when Leany asked for consent, Sanchez-Diaz said he would not mind being searched and held his arms out to the side to allow Leany to conduct the search. *See Pena-Sarabia*, 297 F.3d at 986 (suspect gave voluntary consent by responding "go ahead" to officer's

11

request).

The only evidence in the record that Sanchez-Diaz did not voluntarily consent to the search was his own testimony that he consented because he thought officers would search him anyway. It is well established, however, that when assessing an individual's consent to police conduct, courts are to examine whether that conduct conveyed to a reasonable person that he or she was not free to decline the officer's request. *See Florida v. Bostick*, 501 U.S. 429, 439-40 (1991); *see also United States v. Hill*, 199 F.3d 1143, 1149 (10th Cir. 1999)(stating that particular state of mind of defendant is irrelevant to the objective reasonable person standard set out in *Bostick* other than to the extent that the state of mind was known to the officer and influenced his conduct).

Here, Sanchez-Diaz did not convey any concern to the officers and during his testimony, gave no basis for his alleged subjective belief that he had no choice but to consent to the search. Moreover, there is no evidence to indicate that Detective Leany knew of that subjective belief and then exploited it. Based on the totality of the facts, therefore, the record establishes that Sanchez-Diaz was not coerced into giving his consent, was not under duress at the time, and understood Leany's request. His consent, therefore, was voluntary. *See Soto*, 988 F.2d at 1558.

In this case, the search of Sanchez-Diaz was also justified as a search incident to arrest. An individual may be searched immediately before formal arrest, if probable cause to arrest existed prior to the search. *United States v. McKissick*, 204 F.3d 1282, 1296 (10th Cir. 2000). Leany had probable cause to arrest Sanchez-Diaz at the time he conducted the search of defendant's person based on the specific information from an informant which had been corroborated. *See United States v. Freeman*, 816 F.2d 558, 561 (10th Cir. 1987); *United States v.*

*Swingler*, 758 F.2d 477, 487-77 (10th Cir. 1985); *United States v. Corral*, 970 F.2d 719, 727 (10th Cir. 1992).

Specifically, the informant, who had provided reliable information to the Task Force for two years, told detectives that Ramon was distributing methamphetamine. Detectives then had the informant set up a deal with Ramon over the telephone, and were present while the particulars of the meet were being arranged. In addition, the record establishes that detectives corroborated the informant's information by observing the movements of the Sentra and establishing that the car was driven by an individual named Ramon. The informant positively identified the driver as Ramon. When the Sentra was stopped, the driver identified himself as Ramon Sanchez-Diaz.

Finally, detectives received additional corroboration that Sanchez-Diaz was in possession of narcotics when they arrived at the scene of the traffic stop and were advised that Danno had indicated on the vehicle for the presence of narcotics. Leany had this information before he searched Sanchez-Diaz. Accordingly, at the time of the search, Leany had probable cause to believe that Sanchez-Diaz was in possession of methamphetamine with the intent to distribute. See *Freeman*, 816 F.2d at 561; *Swingler*, 758 F.2d at 487-88. Therefore, the search was lawful as a search incident to arrest. See *McKissick*, 204 F.3d at 1296.

## II.  *Miranda Warning*

At the hearing, it appeared that Sanchez-Diaz may be seeking to suppress statements he made to Leany based on a failure to advise him of his rights under *Miranda*. His written submissions after the hearing, however, do not raise this issue. Therefore, the court does not believe that this is an issue. In any event, the court found the testimony of Leany to be credible

with respect to the timing and content of his *Miranda* warning to defendant. When the methamphetamine fell from Sanchez-Diaz's shorts, the defendant began making incriminating statements. Leany stopped Sanchez-Diaz and advised him of his rights under *Miranda*. The Court finds that Leany advised Sanchez-Diaz of his rights under *Miranda* and that defendant waived those rights.

### III.  Search of Sanchez-Diaz's Home

Even if Sanchez-Diaz did not waive his rights under *Miranda*, the evidence establishes that Sanchez-Diaz and his wife both consented to the search of their residence and neither limited the scope of that consent. In assessing Sanchez-Diaz's consent to the search of his house, the court must again to look to whether police coerced Sanchez-Diaz into giving consent or whether he was under duress at the time. There is no evidence that Leany, or any other officer, raised his voice, threatened defendant or brandished a weapon at him. Sanchez-Diaz made no claims of coercion or duress in connection with his consent to the search of his home. Taken in their totality, the facts before the Court support a finding that Sanchez-Diaz freely and voluntarily consented to the search of his home.

In addition, Leany received permission from defendant's wife, Martina Gonzales, to search the residence. Leany's testimony establishes that Ms. Gonzales freely and voluntarily gave officers permission to enter the home and conduct a search anywhere in the home. After drugs were located in the bathroom, Ms. Gonzales also wrote out a statement, which was admitted into evidence, in which she stated, "At 10:30, they came and knocked at the door. They asked that I give permission that they come in. I gave permission voluntarily."

The record, therefore, establishes that both Ramon Sanchez-Diaz and Martina Gonzales

freely and voluntarily consented to the search of their home at 463 South 500 East in Provo. Because the court has concluded that there were no violations of defendant's rights up to that point, the search of the home was not tainted by any previous conduct. The drugs seized from the residence during that search, therefore, were lawfully obtained.

### III. CONCLUSION

Based on the foregoing, it is hereby ordered that Defendant's Motion to Suppress Evidence is DENIED.

DATED this 16th day of February, 2006.

BY THE COURT:

*[signature]*
DALE A. KIMBALL
United States District Judge